Good morning, Your Honors, and may it please the Court. We appreciate the opportunity to be heard today. My name is Roger Javier. I, along with my co-counsel, Mr. Perry Staub, we represent Mr. Raymond Crochet, the plaintiff, and we respectfully request that you reverse the trial court's grant of the motion for summary judgment for two specific reasons. First, Mr. Crochet's suit was timely filed within one year from the date his injury or his damage was sustained. And second, in the alternative, under the doctrine of contra non volentem, a legal principle not even noted anywhere in the judgment, the plaintiff did not have actual or constructive notice of his damages until, at the earliest, October 7, 2014, when he was diagnosed with tardive dyskinesia, nor did he have actual or constructive notice of the tortious act and the damage. Now, there are several key facts here at play, Your Honors, which I wish to bring to the Court's attention. First of all, Mr. Raymond Crochet, a 65-year-old gentleman, suffers from a permanent neurological condition called tardive dyskinesia. In 2012, he began treating with his doctor, Dr. Nagaraj, for major depressive disorder, and Dr. Nagaraj is the one that prescribed Abilify. Now, in 2014, his primary care physician, Dr. Sharp, took over the prescribing of the Abilify, and he noticed some shuffling gait symptoms. He attributes that to what they called Parkinsonism, a condition completely different from tardive dyskinesia, for which he recommends treatment with a neurologist, Dr. Hauser, who sees our client on August 1 of 2014. Importantly, at that time, Dr. Hauser does in fact diagnose Parkinsonism due to Abilify, and he recommends him to start tapering off the drug. He starts to taper off the drug, Your Honors, and at that point in time, those shuffling gait symptoms went away. That's found on record page 454. Now, shortly after that, he winds up developing some mouth movements. No one said this was tardive dyskinesia, and no one said, importantly, that this was due to Abilify. In fact, nurse practitioner Scott Sonomont testified that he had no idea what was causing his symptoms. That's on record pages 1125 and 1126, but he does recommend he go to Dr. Hauser to figure out what's going on. To be clear, the time period for filing the suit isn't when the doctor makes the diagnosis. Wouldn't it be before where there's a logical connection between the injury sustained and the cause of the injury? I realize that that may, in some cases, and maybe even in this case, be very imprecise, but isn't that the time period that we're searching for where the claimant is on notice of that association? 100% correct, Judge Engelhardt. As a matter of fact, the Fifth Circuit has actually acknowledged that diagnosis is not relevant or paramount for the purposes of determining when prescription begins to run. The key issue is when were the injuries or damage sustained, and the second issue is when does contra-nonvalentam apply. So let's go right into my first point. Well, let me clarify, it's when the injuries are sustained to the knowledge of the plaintiff, of the claimant, and the association between the cause, in this case you indicated that he was off of the drug, so there's an association, or at least arguably an association, between I was on it, and then I had these symptoms, this impact, and then I stopped taking it, and then I stopped having such and such symptoms. So there's an association there, and I realize we may not yet be to the point where he's knowledgeable about a claim, but at least there's a cause and effect association that can be made long before we get to the doctor, right? Respectfully, Your Honor, in Cole v. Celotex, they actually answer squarely that issue, and the answer is unfortunately, or fortunately for my case, is no. There is no sufficient damage, and let's go into that. This case falls squarely within the Louisiana Products Liability Act, for which Article 3492 of the Civil Code establishes one year from the date the injury or damage is sustained. So the critical question, Judge Engelhardt, is what constitutes injury? What constitutes damage? The Supreme Court case, and the best authority on this issue, is the Supreme Court case of Cole v. Celotex. It's a 1993 decision in which the court held, and every case follows it, including this circuit, that damage is considered to have been sustained within the meaning of 3492 when it has manifested itself with sufficient certainty to support an accrual of a cause of action. So when we go immediately back to the question that you just asked me, Judge Engelhardt, as to whether or not shuffling gait symptoms actually puts them on notice of anything, not for a cause of damage, not under Cole v. Celotex. And that is why, number one, that shuffling gait symptoms don't apply, because what we do see on records page 454 is that those symptoms actually went away. Now, in Cole, it's important because those facts are actually relevant, okay? In 1974 to 1984, the plaintiff actually worked for a plant, and he was promoted to a foreman. But in that period of time, he did have some symptoms and concerns. Starting in 1979, he had an abnormal chest x-ray, and he was put on the company's asbestos monitoring program. In 1982, he also has abnormal chest x-rays, and they said avoid asbestos even with a respirator. Now in 83, he had asbestos in his lungs, but at no point in time was there any indication that these damages were permanent, that these damages were long lasting. Now, he retires in 84, but he continues on. He continues on with the asbestos monitoring program, and it wasn't until 1985 that he was finally diagnosed with asbestosis. Now, diagnosis is not the most important fact here, but what is important is whether or not he had damage with sufficient certainty. And the court held, even though you filed suit seven years after you had initial problems, that your suit was filed timely. The evolution of what happened in this case, your honors, is very similar. And going back to the facts, Judge Amberhart, the plaintiff had some issues prior to being diagnosed with tardive dyskinesia. That's clear. But Mr. Crochet was unaware of that damage with sufficient certainty. In fact, like I said, he testified his shuffling gait symptoms went away. And next, with regard to knowledge, Judge Anglehart, the mouth movements that he had prior to his October 7th visit with Dr. Hauser, there was testimony clear that he had no idea what was causing those symptoms. Sonomont, who treated him on record page 11, 25, and 26, says I have no idea what's going on with that as well. So he had no idea that this was permanent. Now- But wasn't there a warning with the Abilify that the mouth movement could occur? There is actually a warning, Judge Graves, in what they call the medication guide. Not in the actual label. It's been called the medication guide. And the only thing, the only thing in the entire almost 7,000 page record that talks about the knowledge that a client had or did not have relative to that, was testimony elicited that A, he read the label months after he started having mouth movements. Meaning, he read the label after he was diagnosed with tardive dyskinesia. Meaning, we filed suit within one year of that diagnosis, or just inferring that. He read the label. What's that? You said he read the label. He read the label. Label that the pharmacy would have given at the time the medication was sold? That was correct. He did, he did read the label. What was included on that label? What was included was that- With regard to warnings. About side effects. Sure. It said, in that label, the only thing that's mentioned with particularity, Judge Graves, is that a side effect of tardive dyskinesia, excuse me, a side effect of Abilify is tardive dyskinesia. With regard to those mouth movements, that's only found in the medication guide. It's not in the label, and our client was only asked about the label in a deposition testimony. He only testified- What's the symptom of the TD? Is the mouth movement one of the symptoms of the- That is one of the basic mouth movements, grimacing, oral grimacing. Shuffling gait syndromes are not, I repeat, are not a symptom of tardive dyskinesia, which is important in this particular case. Additionally, those shuffling symptoms went away. And it is very clear from the court's decision that it ruled on page nine of their decision that once the plaintiff, once Mr. Crochet even had those shuffling gait symptoms, that he had one year from that date in order to go ahead and file his lawsuit. And that's incorrect. If this court were to grant a motion for summary judgment, asked to prescription based on the trial court's ruling, then if a plaintiff has any adverse condition relative to the drug, whether damaging or not, irrespective of whether or not suit was filed based on that injury or something else, then suit must be filed whenever the patient has any adverse reaction to the drug. So Judge Graves, let's take for example if you started taking prescription drug X today and you started to develop headaches, but those headaches went away, let's say in December, and then in July you wind up being diagnosed with a psychiatric condition related to the drug. Then under the trial court's ruling, you would be required, even if those symptoms went away, to file suit one year from the date you start having those headaches. And we know that ruling is wrong. And the critical inquiry in this case should have been, when did the damage occur? When was there sufficient certainty that he was damaged? In this case, it's very clear. While diagnosis is not the requirement, in this case it happens to be clear that he sustained those damage on October 7, 2014. Now, in the alternative, if this court were to find that his symptoms that he had prior to that formal diagnosis somehow constituted damage, then under the doctrine of contra non volentum, this would also serve to toll prescription. And your honors, I read the judgment several times, several times, and nowhere is there any mention of the term contra non volentum in its ruling, despite the fact that this was argued in the alternative by us. Now, as this court knows, there were three requirements regarding that doctrine. Number one, the defendant must prove that the plaintiff had actual or constructive notice of the tortious act, the resulting injury, and lastly, the causal connection between the two. Or that the plaintiff's lack of knowledge was somehow willful, negligent, unreasonable. Importantly, contra non volentum looks to the plaintiff's actions, as long as he acts reasonably to discover the cause of the problem. So if this court were to somehow find he was damaged before that diagnosis date, then the question is, does contra non volentum apply? And the trial court never discussed it. Next, the best authority on the issue of contra non volentum is found in the case, this court's case, of Chevron v. Baker, there was a bolt that failed in 2001. In 2002, underwater dives and a video revealed a problem with the installation, and most importantly, a problem with the manufacturing of that bolt. Now, suit was filed two years after the bolt failed. The court, this court, when finding that suit was timely filed, held that the one year prescriptive period did not begin to run until after, until after the plaintiff conducted his investigation to discover the source of the problem. The court rejected the defendant's argument that prescription should have began to run once that bolt failed. What the defendants are doing in our case, and what the trial court held, is that once the plaintiff started having any adverse effects of a billified, even if they went away, then prescription begins to run. That's simply not the law, as clearly demonstrated in Chevron. And also, the trial court failed to acknowledge the plaintiff's own reasonable investigation. In Carter v. Matrix, this court actually cited to the Supreme Court case of, Louisiana Supreme Court case of Jordan v. Employee Transfer Corp, which held that prescription's not going to run at the earliest possible indication that a plaintiff suffered a wrong. When prescription begins to run depends on the reasonableness of the plaintiff's action or inaction. In Naps v. B&B Chemical, another Fifth Circuit case decided by the trial court, this court focused on the reasonableness of the plaintiff's action. Now, if you look at Naps, Naps washed planes as an Eastern Airlines employee in 1982. He comes in contact with the defendant's product in 1983. And he alleges that the soap caused him to have severe and permanent skin disorder. And he even alleges that this happened at the first instance in 1982 when he used the product. He treats with a bunch of physicians consistently to figure out what the problem was relative to his injuries. And it wasn't until 1986 that the doctor related the condition to that product. So despite the fact that he filed suit in that case, four years later, this court filed that the suit was timely. Now, the trial court found in that case that the awareness of the condition, this is kind of what we spoke about, Judge Enghart, the awareness of the condition and its cause put him on constructive notice of his claim. But on appeal, this court vacated and applied the doctrine of contra non-valentum to look at the plaintiff's conduct. What did he do to determine this? And you're honest, that's the main difference between this case and in the Jenkins case. The Jenkins case for which Judge Southwick, you were actually on that panel. In Jenkins, suit was filed on October 17th, 2014. Over a year prior to that, specifically in April 2013, the plaintiff is told that Abilify is causing his TD. That's on page 795 of that decision. The plaintiff even confirms this in his testimony, page 796. There was no dispute when he sustained that damage in that case. The question then begs, does contra non-valentum apply? And it looks to the plaintiff's action. And in holding it, it doesn't apply to interrupt prescription. On that panel, Judge Southwick, you guys acknowledged that he had canceled his medical appointments in May of 2013. So we look to the reasonableness of the plaintiff's actions here. Your Honor, this case or the law. Counsel, you wanna touch on what you contend, I think, is a mischaracterization of your client's statement of the deposition with regard to Abilify. Yes. Recognition that there was some symptoms that may have been related to it and that he actually did some research. Yes, without question, Judge Graves. All right, the defendants are going to have to make you believe that he had somehow this knowledge. But timing and the substance of that knowledge is very important. Because, first of all, they fail to mention that Mr. Crochet clearly testified that he looked up the drug months after he had the mouth movements. Those mouth movements were right before the October 7, 2014 appointment. So the timing's important. Now, while they suggest that somehow- He did his research when? After October 7th of 2014, after suit was filed. We filed within that one year, that period of time. Now, most importantly, let's look at what the substance was. When he testified that he looked at the label, he testified he looked at the label. There was no discussion about the medication guide, and the medication guide is the only, I repeat, it's the only place in the information packet. And an information, medication guide's different from a label that talks about tardive dyskinesia. And the latter of the above, this court should reverse the decision of trial court because suit was filed timely. Thank you. Good morning. May it please the court, my name is Matt Campbell and I represent, I'm here on behalf of both of the appellees this morning. This case raises the question on appeal of whether Mr. Crochet's personal injury claim is prescribed by Louisiana's one year prescription period. Under Louisiana law, that prescription period begins when two things happen. One, the plaintiff becomes aware of their injuries. And two, they know or should know of some connection between those injuries and the defendant's product. In this case, the undisputed evidence shows, including Mr. Crochet's own testimony, that he had suffered involuntary mouth movements, of which he was aware, in August or September of 2014. And that he admitted in his own testimony that he became aware of the link between those mouth movements and Abilify at the time that they had begun. That is the evidence on which the district court relied in finding that Mr. Crochet's claim is prescribed. Plaintiffs here argue that the record on this issue is ambiguous and not appropriate for summary judgment. We disagree. Now I think it is telling that the appellant's discussion waits until about the end before they talk about what we really think is the evidence that decides this case. And that is the testimony by Mr. Crochet about when he discovered his mouth movements. And that testimony, we think, is critical for the court to understand. So that is the question and answer. That is testimony that we believe is clear and unambiguous on this question. It appears at page 474 of the record on appeal. And it's a question that is posed by defense counsel, clear and unambiguously defines the time period in which the defense counsel is referring. It says, you are taking Abilify, you stop taking Abilify, and then you start experiencing the mouth movements. And so at that point, you knew it had to be the Abilify because that's what happened when you stopped taking it. Plaintiff's counsel did not object to the question, to the form of the question as being vague or ambiguous in any other way. And Mr. Crochet answered the question unequivocally. He simply said yes. And he did so without seeking clarification and without suggesting he was confused in any way. Coupled with the undisputed evidence that his injuries began in August and September of 2014, the only reasonable inference that the district court and this court can draw is that he became aware of his injuries and they're linked to Abilify before his second appointment with Dr. Hauser on October 7, 2014. Because he filed his case on October 7, 2015, that would make his case untimely. Plaintiff's counsel themselves admitted to this interpretation of the testimony. In footnote 49 of their opening brief, they stated that plaintiff's counsel, too, originally interpreted, quote, the time period referenced, close quote, in this testimony, quote, as referring to the period prior to Crochet's second appointment with Dr. Hauser. In fact, citing this very question and answer in their opposition to our summary judgment brief in the district court, plaintiff's counsel described the timeline as follows. And this is a record of 3,057. Plaintiff's counsel themselves described the timeline as Crochet developed uncontrollable movements of his mouth and jaw, including lip smacking and jaw clenching. Crochet thought that stopping Abilify might have caused the problem. Crochet therefore immediately made an appointment to see Dr. Hauser and visited him on October 7, 2014. That is a clear admission there that he had had knowledge of the link between his mouth movements and Abilify prior to his meeting with Dr. Hauser on October 7, 2004. And interestingly, the district court itself restated that very sentence, that Crochet thought that stopping Abilify might have caused the problem verbatim in her decision that granted our motion for summary judgment. We submit there's no other reasonable inference that can be drawn from this testimony. It is directly on point on the question. And there is no other testimony from Mr. Crochet anywhere else in the record where he testifies contrary to this point. For example, he never testifies that he didn't learn about this until he met with Dr. Hauser. He never says that. That's nowhere in the record. He never testified that he thought his involuntary movements were the result of some other condition. He testified that there was only one variable that it could be. This is not a case where the record is confusing. Plaintiff's claim instead is that Mr. Crochet himself was confused when he answered the question, not that the record is confusing. The problem with that is that plaintiffs themselves have failed to deduce any evidence that Mr. Crochet was confused with the testimony or that he didn't actually learn of this link between his involuntary mouth movements and when he met Dr. Hauser on October 7th. He wasn't asked to clarify this testimony on redirect examination. He did not clarify this testimony in the errata sheet that he submitted after his deposition was done, the signed errata sheet. In fact, he clarified other things. He didn't clarify this question and answer. And when the issue was raised and presented on our summary judgment motion in the district court, they submitted no sworn statement from Mr. Crochet to these facts that would contradict the one piece of testimony in the record that he knew it before he saw Dr. Hauser. This is fatal given the two different burdens that plaintiffs bear on this appeal. The first is a substantive burden under Louisiana law. It's clear, and I'm citing from the Eldridge case in our brief from the Fifth Circuit, that if the defendant proves that one year has passed between the tortious act and the filing of the lawsuit, and the burden then shifts to the plaintiff to prove an exception to prescription, the courts have understood that to be as long as there is proof that the injury itself, that the plaintiff became aware of the injury itself more than one year, the burden then shifts to the plaintiff to then establish that an exception to preemption, in this case contra non volentem, applies. A second burden that they have is the summary judgment standard under federal rule of civil procedure 56. It provides once the moving party has set forth a factual basis for them to be entitled to judgment as a matter of law, the burden shifts, and I'm quoting from Albaugh, the case we cited in our brief, the burden shifts to the non-moving party to come forth with specific facts that show there is no genuine issue for trial. And cases we also cite explain that they have to do so by coming up with significant probative evidence of the genuine issue. That's the Mojete case. They can't do it simply by unsubstantiated assertions, describing some metaphysical doubt in the evidence or some conclusory allegations. That's the Owen case. And they can't do it by just generic challenges to the witness's credibility. In this case, a generic challenge to their own plaintiff's credibility or his own memory about whether he was accurate in his answer to that question. That's the Seventh Circuit's Trentitude case that we played. Plaintiffs, I would like to respond briefly to some of the statements that were made by appellate counsel during their argument. The first is that the district's court never mentioned contra non volentum in the decision. This is just not true. If you look at page six of that decision, where it lays out the prescriptive period in pharmaceutical product liability cases, it states, under the Louisiana Civil Code, a plaintiff has one year from the day injury or damage is sustained in order to file a claim. However, Louisiana courts apply the doctrine of contra non volentum. It goes down and says courts have summarized the contra non volentum doctrine as requiring inquiry into the reasonableness of their behavior. The district court clearly resolved this issue of whether it was clearly briefed and the district court clearly addressed the issue of the applicability of contra non volentum in the decision. Secondly, appellate counsel describes the basis of the district court's decision as being the reliance on the episode, the prior episode in which Mr. Crochet suffers from Parkinsonism and then gets told he has Parkinsonism and told that it's related to a vilify. That is not the basis of the district court's opinion. And in fact, on a motion for reconsideration that plaintiffs filed below, they argued that his shuffling gait was not the cause of tardive dyskinesia. Therefore, the court erred in finding this is an undisputed fact. Defendants, we had argued that the court did not rely on the shuffling gait symptoms for its holding. And the court clearly says on page five of their order on the motion for reconsideration that we are correct. They state that that was not the basis of the decision. The basis of the court's decision is the testimony from Mr. Crochet, the unrebutted testimony from Mr. Crochet himself, that he became aware prior to prior to meeting with. He became aware at the time that at the time that the stop taking a vilify. And he began to suffer from those symptoms. That is clear in the evidence and it's unrebutted. And on a summary judgment motion, that has to carry the day. I would note even if plaintiffs could have raised some genuine doubt about whether Mr. Crochet was correct in making a statement about having actual knowledge, it's clear that under the law that Crochet had constructive notice of his claims before October 7, 2014. The undisputed evidence that was available to Mr. Crochet at the time was that by August 1, 2014, he already had been told by his doctor that a movement disorder, in this case Parkinsonism, was likely caused by vilify and that he should stop taking the medication. Now, whether or not Parkinsonism and tardive dyskinesia are related, separate, is not relevant to the point. At a minimum, he understood that a movement disorder could be caused by vilify at this point in time. Shortly thereafter, he stopped taking vilify. And as Judge Engelhardt, you pointed out, there was a temporal association, a very quick type temporal association. He stopped taking vilify and tardive dyskinesia emerged. And then he scheduled, he testified that that was the only variable. And then he scheduled an appointment with the same doctor who had diagnosed him with Parkinsonism related to vilify. And the key point that I know that appellate counsel discussed is that both the label and the medication guide at this point in time both defined, both identified tardive dyskinesia as a case. And as we stated in our brief, the label is a document that comes with the medication. So is the patient medication guide. The medication guide is actually called the patient medication guide because it is a more simplified, more colloquial version of the more detailed label that is targeted towards physicians. The label itself for physicians had described tardive dyskinesia in a page long warning. The patient medication guide itself similarly told patients to call their doctor if they experienced any movements you cannot control in your face, tongue, or other body parts, which may be signs of a serious condition known as tardive dyskinesia. And the patient medication guide also stated tardive dyskinesia may also start after you stop taking vilify. And the critical component of this is Crochet testified that at some point in time, and the record is unclear, I'm happy to go through it, but it's not clear when he actually looked up the label. But in any event, it is clear that when he chose to do that, he readily saw that vilify is related to tardive dyskinesia. At any point in time, he could have done this. And under the Louisiana Court of Appeals decision in Raybourn v. Albaea, this is enough to establish constructive. This is more than enough. This is more robust facts than you see in that case. In that case, plaintiff alleged injury from Medtronic's infused medical device. And the court found that the infused product insert put Mr. Raybourn on notice at the time of his surgery to his potential claims against Medtronic. So we contend that it's an unrebutted statement. There's unrebutted evidence in the record on summary judgment of direct testimony from Mr. Crochet that he knew before October 7, 2014, in which case that is more than a year before he filed suit. And secondly, even if the court were to disregard that, that there is clear constructive notice, a robust set of evidence that would have put him on notice of his case under Louisiana law. I would like to – a couple of things that I wanted to respond to. The Chevron and Knapp's cases that plaintiffs – that the appellant refers to, those cases are – define a very specific doctrine that this court has approached or this court has described in the Peterson case. That is under Louisiana's – under Louisiana's contra non-valentum doctrine. There are exceptions to – there is tolling of the prescription period if there is a question about which defendant or which cause is possibly responsible for the injury. Those cases both describe that situation. And the Peterson decision recently of this court described this as what's referred to as the specific defendant doctrine. If it's unclear who is responsible, then the court may toll – if the evidence around it is reasonable for the plaintiff not to proceed, then the court may toll. In this case, there is no claim that there was anything other than a vilify that caused this. No doctor ever told him it was something else. No doctor ever – he never suspected or testified that he suspected it was anything else. And in these circumstances, when he had just recently had another movement disorder that was caused by a vilify, it's not surprising that he didn't suspect anything else. So those cases are not – those cases are not on point here. And, in fact, the Peterson case describes exactly why they are not. A related point he did – appellant counsel stated that no – none of his doctors told him that a vilify – that he had tardive dyskinesia or that tardive dyskinesia was related to a vilify before he met with Dr. Hauser on October 7, 2014. Our view is that that's an irrelevant fact. The question is whether he knew and not whether doctors had told him. It is clear when he testified in his deposition that he explained why he came to the conclusion that this may be related to a vilify. And that is because when he stopped taking the medication, these symptoms immediately started. And if there are no questions on that, I'd like to make just a few quick points about alternative grounds for affirmance. We don't think that the court need reach these, but, of course, these were also briefed before the district court and were not reached. I think the simplest thing to do is to talk about plaintiff's design defect claim. In a design defect claim under Louisiana law, you must prove the existence of a safer alternative design of a vilify and that the danger and the damage outweighed the burden on the defendant of adopting that alternative design. In a pharmaceutical product liability case, this requires expert testimony. Plaintiff doesn't have expert testimony on either of these points. On the safer alternative design, the only thing that plaintiff cites is an affidavit of one of Mr. Crochet's treating physicians, a general practitioner, who said, I might have prescribed, looking back now, I might have prescribed him Cymbalta. But as the Robertson case holds that we cite, simply identifying another drug is not describing a safer alternative design of this drug. It doesn't meet the requirements. Secondly, on the risk utility prong, courts refer to the second prong often as the risk utility prong. This is showing that the cost of changing the design is outweighed by the risk that can be avoided of the change. Plaintiff cites no evidence and none exist on this at all. Plaintiff's brief merely states that the risk just simply affirms or states that the risk outweighed the burden but offers no citation in their brief to any of this. Just a conclusory statement is insufficient under the Moetti case I already talked about. Non-moving litigants required to bring forward significant probative evidence and it's not enough to just simply assert this. And the Broussard case that we cite is a case in which the failure to offer any evidence on this prong is fatal to plaintiff's claims. And similarly, I'll try to be brief, similarly on the failure to warn claim and the learned and intermediary doctrine, it's clear that Louisiana recognizes the learned and intermediary doctrine. What the learned and intermediary doctrine does is it states that the drug manufacturer's obligation or duty is only to warn the doctor not to warn the patient because the point of that is because the doctor themselves is prescribing a drug like this and so the doctor's decision in weighing risks and benefits is a relevant question. Every one of Mr. Crochet's doctors testified that they were well aware that tardive dyskinesia causes or that Abilify causes tardive dyskinesia, that drugs of this class, atypical antipsychotics, it is a well-known that all of them learned in medical school and they all agreed that this is an obvious risk and that the warning label was adequate and plaintiffs did not get evidence during the course of those depositions that any of them would have changed their behavior had they been provided what plaintiffs claim is the missing information there. And if there are no other questions, Your Honors, I will conclude. Thank you, Your Honors. I have six points to make. Number one, with regard to the judgment, absolutely the trial court did not apply contra non-volantum. As a matter of fact, counsel mentions that she didn't discuss shuffling gait, but she says prescription began the one when Mr. Crochet's symptoms, shuffling gait, etc., etc., etc., started to develop. So she does discuss the shuffling gait symptoms, and they're concerned about it because they should be. The reality is that the shuffling gait symptoms does not constitute damage because those symptoms went away on record page 454. Next, they also acquiesce that the medication guide is not the label. They try to take great pains to try to suggest to you, well, it's not the label, but it's part of it. It comes in conjunction with it. The medication guide is not the label. He wasn't asked about the medication guide. He was asked about the label. He testified unequivocally that he discussed and looked up Abilify about mouth movements after, I repeat, after he had the mouth movements, which is after the diagnosis date. That's on record page 405, record page 405. The fourth point I want to make is all you heard on argument was that our client thought it was Abilify that was causing it. He thought it was that. Well, his question is this. Is thinking knowledge with sufficient certainty to satisfy the accrual of a cause of action on McCall v. Celotex? The answer is no. Is it under the Fifth Circuit case of DAPS v. B&B where the guy said I used this product and I was injured as a result of the defendant's product? This court held that the filing of a lawsuit four years after that statement was actually sufficient because the plaintiff's reasonable actions were to find out what was going on. And so under counsel's belief, under DAPS v. B&B chemical, this court's decision was actually wrong. It had prescribed because he had knowledge with sufficient certainty of that injury. He talks about my fifth point, the Eldridge case. The Eldridge case, you got to look at the facts of Eldridge. Eldridge, the plaintiff, was suing for damage to property based on a trespass. Suits filed in 1998. But guess when this trespass happened? In the 1960s. They were damaging his trees. They were damaging his property. And there was testimony by the defendant that they have not even been operating in Louisiana since 1995. So no wonder that case was prescribed. De novo review. Any inference that they're trying to suggest that you can conclude out of it has to be in favor of us. Has to be in favor of the non-moving party. And finally, when you apply the law in a case, the law is always going to be the law. It's kind of like paint that you're applying to a surface. You're applying to a surface. So if you take paint and you apply it to the wall, I promise you that dove gray paint that you like so much, when you apply it to the cement, it's going to come up with a different viewpoint. And when you apply the law to the facts of this case, the district court got it wrong and you should reverse that decision. Thank you. All right, count.